Good morning, and may it please the Court. My name is Danny Honorato. I represent the Republic of Korea and its Defense Acquisition Administration in this matter. Your Honors, we are here to address what I respectfully submit are a series of fundamental procedural, factual, and legal errors that occurred in the proceedings before the District Court. First, the District Court had no proper cognizable basis to ignore the Mandatory Form Selection Clause in the MOA. Second, the Republic of Korea enjoys sovereign immunity in this matter, and there is no valid exception to it in this case. And third, assuming arguendo that there is somehow jurisdiction in the United States, there are material issues of fact that prohibit the granting of summary judgment. In short, we respectfully submit that this Court must reverse and amend the matter to the District Court with instructions to dismiss the case. I will first address the Mandatory Form Selection Clause. That mandates dismissal, so this matter can be litigated, frankly, in the only venue in the world where the parties contemplated it. That's the Seoul Central District Court. There are six key facts that dictate dismissal based on form nonconvenience. First, the MOA was a result of a Korean public procurement process in Korea. Second, BAE, a sophisticated corporation, voluntarily reached into Korea to participate in that process. Well, if we should find that the Form Selection Clause is permissive, then does that matter? Well, first of all, if we want to address whether it's permissive or mandatory, because if we go to the language of it, Your Honor, I don't see how anyone can read it as being permissive. What it says is that BAE agrees to a Mandatory Form Selection Clause that had mandatory unambiguous language requiring a litigation, a singular litigation, be resolved in Seoul, Korea. Here's what it says for the record. It shall be resolved through a litigation and the Seoul Central District shall hold jurisdiction. It doesn't say that someone else does not have jurisdiction, does it? Well, I don't think it needs to. I think that this is an area where we're informed by the case law. So you look at the, and I'm sure you have looked at the various cases. And if you look at the cases, it looks to me like it's pretty clear that this is permissive. Well, I respect that. Talk to me about that. Sure. I respectfully disagree with Your Honor. First of all, we have a double shall provision. So not only shall it be, but it shall be held in this particular court. There's no ambiguity there. That is not permissive. That is mandatory. Well, Fourth Circuit has taken a very sort of narrow view of this and said that you need specific language of exclusion. And we've just acknowledged that there's no specific language of exclusion here. In other words, it does not say the District of Korea and only Korea or can only be. So I think you can read it as it can only be because it says it shall take place. So you have the double shall clause. And that's what distinguishes the permissive case decided by the plaintiff in this case. It shall be in this court and then shall be a specific court, in my view, can't be anything other than mandatory. So let's look at it. If you just had one shall clause, it wouldn't be enough. Because there is Fourth Circuit law saying that's not enough, right? Well, I wouldn't concede that. But what I'm saying is we're not in that situation because we have a double shall. And look, so I'm going to admit to the court that I'm not a civil practitioner by nature. I'm more of a criminal practitioner. But we have statutes, right? So we have statutes where the word shall is given its everyday meaning. So you have a statute which, frankly, involves whether people who commit identity theft can get put on probation. And the statute reads that you shall not put someone on probation. No one would argue that that is permissive. And I think when you look at this contract and you look at the sophisticated natures of the parties, this court shouldn't read that twisted conclusion. And if you look at the cases that we cite, you start with Freeman. Any dispute arising must be, that's mandatory, and shall be and must be are interchangeable. Excel versus Sterling Boiler shall be in the state of Colorado and venue shall lie in the county of El Paso. We're in the same boat there because we're talking about the Seoul Central District Court. Now, Mr. Renato, you've got a lot of really complicated issues in this case. I do. I think you've done a good job of telling us your position in the forum selection issue. Thank you, Your Honor. And it might be a good idea to start tackling some of the others. Yes, Your Honor. So if I lose on mandatory, and I'm not conceding that I do, then you have to analyze Trimble, right? So then we go to whether it's national security interest. I frankly think that the court's analysis of Trimble, and we're going to talk about Trimble now and probably for the rest of my time, but that misses the mark. First of all, as the court is aware, the Supreme Court and Atlantic Marine has said that a forum selection clause should be in control in all but exceptional cases. The burden is on BAE to demonstrate that venue is unwarranted in Korea. The only way to do that is to talk about Trimble. And I believe that the rationale offered below is rooted in a misapplication of this court's ruling in Trimble. In Trimble, this court identified a national security interest in an FMS transaction as the contractual relationship between a U.S. government and a U.S. contractor. Trimble recognized the obvious national security interest in preventing third-party suits. And this is where it's key, so that a foreign government doesn't step into the shoes of the U.S. government and try to enforce a contract. Okay, but here you've got a situation where the letter of agreement, the initial one had been signed, and the process had begun to be one between the two governments rather than between South Korea and BAE. So at the time the letter of agreement is executed, as I understand it, then the matters have to be resolved by conciliation or negotiation between governments. And since this dispute arose after the LOA, the first one, had been executed, why isn't this a situation that required the two countries to work it out? And why were the terms of the memorandum agreement even longer in play? Okay, so I anticipated the court's question, and that's for two reasons. First, there is a two-step process here, right? So process... The same two-step LOA? Correct. And the LOA extends through the second LOA, which was never consummated. So the terms of the MOA survive the first letter of agreement, which talked about the negotiation phase of the contract. Right, but once the first letter of agreement was signed, you had the two countries, in an LOR, a letter of request. Correct. The Republic of Korea said, we want these weapons. The United States and the Republic of Korea then enter into a letter of agreement. The United States government, subject to pricing and other qualifications, will provide this. Why wasn't that the point at which the curtain dropped down on the ordinary civil litigation process? Because the remedy at that point was negotiation between the countries, the government. Well, so I guess if we're talking about whether a national security interest applies... No, I'm just talking about the nature of the process. Once the LOR is followed by an LOA, why then does it not simply become a matter for resolution between the two governments that have entered into this agreement? Because, first of all, the U.S. government was aware that the MOA existed and was something that was negotiated by the parties, and that this price term was included. The regulations allow for this type of negotiation to take place outside of the terms of the LOA. Do you think the U.S. government is bound by that? No, no, but I'm saying that they're aware of it, and they frankly allow parties to come to these type of price... They definitely do allow a competition. But my view is that those disputes only take place, if you read Trimble, what it says, they only take place after the LOA has been executed, after delivery. Trimble only applies to a situation where someone tries to step into the shoes as a third-party beneficiary of the United States government. Well, that was the case in Trimble, but that doesn't mean that the rationale doesn't go. Well, so I would note that Trimble wasn't an unanimous opinion. I think there's an aptly put dissent which criticizes the majorities holding. But frankly, my view of it is that the government allows what we call ancillary agreements to take place. This is nothing more akin to an ancillary agreement, where if the national security interest is so triumphant and is so important, why do we allow this direct situation to occur where the contractor can do what we're attempting to do? It makes no sense that the structure would exist in that fashion. So I don't see how this court cannot look at the fact that ancillary agreements are permissible and allowed under the rules, and yet an MOA, which is agreed to in a foreign country, would hold any kind of different weight. Well, you know, but I guess my question still remains. Once you have the LOA entered into, the efficacy of the agreement apparently falls by the wayside if any dispute as to pricing, and pricing is what's at issue here, isn't it? It is, but this Right. Any dispute as to pricing has to be decided between the member governments. So we never got to the second LOA because we could never agree to a price. Right. Tell us then what difference does it make that there were two, there was one LOA executed and the other never executed? Well, because How does that make a difference? The difference that it makes, in my view, is that the FMS program is designed to have countries not fighting, in certain instances, with contractors within the confines of an executed contract where a product is delivered, like in Trimble where the defective allegedly radar equipment or chips were presented. Here, we're not there. We're not in a situation where a matter of national security is raised because we didn't even execute the contract to get us to that point. We're trying to get to that point. So if you're allowed to negotiate in this fashion, it just stands logically that you can't go, you can't put yourself in a position as if the contract has already been signed because it hasn't been signed. Part of it, something had been signed in the first LOA. Correct. What was the legal significance of the first LOA? There was no legal significance because the Republic of Korea and DAPA informed BAE that indeed the MOA still existed with respect to Part 2 of the contract, or the LOA. So in our view So are you saying, and I don't mean to, I just want to make sure I understand it. So you're saying that if the second LOA had been signed, then the curtain would have been without any force in effect? Well, I will concede that under Trimble, that would be consistent with the court's ruling. If the second LOA was, but I think Trimble requires more. I think Trimble requires, because there's generally a price determination made and a delivery made. So that part would control, but I don't think it controls here. And when you look at the national security interest that's been articulated here, I just do not see it. We are talking about a best efforts contract. And that best efforts contract certainly is not inextricably intertwined with that LOA. All Korea is suggesting to BAE is that you have to give us your best efforts. If I come to you, so what happened here is, and I'm burning through time, so I'll go quickly. But Korea says, hey, open market, tell me what this is going to cost. Lockheed has done this before. And BAE comes in. And what if they come in with a false bid and say, you know what, we're going to do it for $10 billion, but you know it's going to cost $20 billion. And Lockheed's going to charge more. Well, of course, they're going to get the business. So if Korea were to determine that they didn't use their best efforts because they were duped, as is the case here, they should be able to rectify that problem. And I think when you talk about a quarter billion dollar price increase attributable alone to BAE, that's something for this court to consider. So I'm going to move on to the forum to briefly sovereign immunity. Can I ask you just one question? Korea wanted the contract to be designed in this way. Isn't that correct? Correct. With its choice. Correct. In fact, the rules allow it to occur that way, Your Honor. I understand that. So if we go to the Foreign Sovereign Immunities Act, quickly, our view is that it's axiomatic that a foreign nation like the Republic of Korea and its agencies, DAPA, are immune from any suit in this court unless a statutory exception exists. First of all, there's no commercial activity. And second, of course, there's no waiver. I'll address waiver first and briefly. As the court knows, the record has at least five instances where the Korea contested this sovereignty. So first of all, in its responsive pleading, the motion to dismiss, it said that the court need not address it, but this court did not give rise to an exercise of jurisdiction under the Foreign Sovereign Immunities Act. In its responsive pleading, it denied venue. In its third pleading, again, that's the answer, the original one. It denied that venue was appropriate. Fourth, which was timely filed, it also denied the applicability of the Foreign Sovereign Immunity Act exception at bar. So we would respectfully submit to the court that those show that there are no waiver. The court didn't find any waiver. And if you look at Tamimi at all, Tamimi says, in essence, that these are to be construed narrowly. And frankly, on this record, I don't think that the court can conclude that. The more important issue, and this is where I think BAE talks out of both sides of its mouth, is that we would submit- I'm going to give you five additional minutes, and I'll give the other side five additional minutes too. But just know that's it. Yes, Your Honor. So use your five minutes as you wish. Thank you, Your Honor. If the court looks at the logic and rationale for application of the commercial activity exception that BAE and the district court has taken, and that primarily rests upon the notion that there was a security interest at play in the MOA, and they were intricately intertwined, I think you have to take an inconsistent position to affirm the waiver of sovereign immunity under the commercial transaction argument. So for instance, the argument shifts to the notion and conclusion that the MOA is now a simple standalone commercial contract that is distinct from the FMS program. They can't have it both ways. So either it's part of the FMS transaction in the first instance, where we're talking about forum, or it is distinct like it is here. But they can't have it both ways. And that's what they're trying to do. And you need not look beyond page 60 of their brief, where they discuss the Heroth case. They make the argument on jurisdiction while trying to salvage jurisdiction, while trying to save it under the commercial doctrine activity. They write here, quote, as noted, the MOA and letters of guarantee are directly at issue, not the upgrade program LOA. The MOA and letters of guarantee are distinct from, if not inconsistent with the LOA, and they're not sovereign-to-sovereign agreements. Talk about trying to have it both ways. Either- That would be a good jury argument. Well, but I think Your Honor should construe it. Because we're talking about the identical type of contract, and the identical language, and the identical rationale. So they can't win with that analysis under both- Right, but yours is just as inconsistent, isn't it? You're saying there's no commercial transaction, and there's no national security. Well, here's why it's different. It seems to me both of you have got a problem with your- There's some tension. Well, there's some tension. But here's why I win. Because if you look at the Saudi Arabia versus Nelson case, the court says you have to, when it exercises powers that are only exercised by private citizens, and those powers are peculiar to sovereigns, so they lose. We are in a unique situation. No private player can go into the market and say, hey, by the way, I'd like to buy some F-16s. And that's what this contract really governs. And when you look at the case law, you look at Haraf, you look at Saudi Arabia, they lose. Their analysis fails. Okay. You've exhausted your five minutes. Thank you, Your Honor. Probably yourself as well. Thank you.  My goodness. Mr. Williams? Can- Is it possible that you could start where he ended in addressing this tension that- On the sovereign immunity issue, of course. May it please the court, my name is Greg Williams, Wiley, Ryan, LLP. I represent BAE Systems. I will certainly start with the foreign sovereign immunity issue. I don't, in fact, think that there is any tension within our argument. We are arguing that the claims of DAPA arise under the MOA. They are bringing a claim in Korea today for a breach of contract and requesting money damages. This is a quintessential commercial dispute. However, that dispute is preempted by the policies, procedures, and requirements of the FMS program. They're not bringing a claim under the FMS program. They're bringing a claim that's preempted by the FMS program. They're not acting as a regulator of the market. They're seeking money damages. And so what- At what point in time did the curtain drop? When the first LOA was signed? In essence, this agreement was unenforceable from the beginning. They are trying to exercise control over the FMS pricing that they are not permitted. As Your Honors noted before, there is a role that a foreign government can play in FMS pricing. What they can do is they can hold a competition and they can present the results of that competition to the U.S. government. The U.S. government, however, as DAPA has now conceded, is not required to accept the results on pricing or for the competitor, the contractor. That's in fact what happened here. The U.S. government looked at the results of that competition, the pricing that both DAPA and BAE preferred, by the way. We agreed with the pricing that DAPA wanted. The U.S. government said it isn't sufficient. And what the MOA does is attempt to carve out for Korea a role that is well beyond what a foreign government is allowed under the FMS pricing structure. It's nothing like an offset agreement, as my colleague was suggesting earlier, and we can get to those details in a minute. And I think it's worth noting that pricing under an FMS program is not a widget. We're not talking about a single number. This is a price that captures a wide array of technical, programmatic, and national security concerns. For example, here, the upgrade program pricing reflected the technical requirements for radar, for computers, for other systems, the number of test flights that were going to be done, the scope of the program, how many aircraft were going to be upgraded, how many spare parts, technological sharing, interoperability requirements. All of these things are bound up in a price. You don't just say, hey, I want an F-16 upgrade program. Well, Mr. Williams, are you essentially saying that you entered into more or less a worthless contract with the South Koreans because there was really nothing that could be done about pricing from your control over pricing? Korea had no control. You really had no control either. So what's the value of this contract? Sounds to me the contract's a sham from what you're saying right now. So there's both a factual and a legal response to that. I'll start with the factual. So the reason this contract is in existence is not simply a matter of BAE. BAE didn't go to Korea and say, please let me have this agreement. Korea dictated this agreement and the associated letters of guarantee not only on BAE but on all the competitors in this program. And further, there was a period of time, as you'll see, it's reflected in our brief, that there was a possibility that BAE's portion of the program might be DCS, direct commercial sales, in which these types of agreements would be permitted. However, it then shifted to FMS. U.S. government rejected the idea of DCS. You're saying it wasn't a meaningless agreement as long as it was a DCS transact, or a possible DCS. A possible DCS. And further, in the end, this is not an issue of BAE's activities or performance. The question is whether does the FMS program allow a foreign government to assert this type of control over the FMS process and bring these types of claims? In fact, I would say, your honor, the fact that this contract exists is evidence for why these types of claims cannot go forward. The FMS program does not allow a foreign government to exercise this type of influence, this type of control over a contractor. In reality, we all know that contractors are going to want the business. And if foreign governments are allowed to now dictate these types of requirements that run directly contrary to the FMS program and its requirements, they're going to do so. So I think the evidence of the agreement actually shows exactly why their claims are not permissible, not why they are. Can you tell me in a few words what national security problem is posed by allowing Korea to enforce the MOA? National security problem. Absolutely. And I was partway through that, just a moment ago, and I interrupted myself. So let me just finalize. Well, maybe you said it already. You'll say it in capital letters. No worries. I was saying that the price of an FMS program is not simply a single unitary price. It's one that reflects all of these various concerns. Those concerns are foreign policy and defense concerns. When the U.S. government reserves for itself the right to control the price, and we can talk a little bit about that control if you need to in a second. But when they reserve to itself the right to control that price, they're also reserving to itself the ability to control all of those foreign policy and national security aspects. Just let's take one. Classified information sharing. What type of program are we going to have? What's going to be shared with our foreign allies? That can have significant price implications. And if the foreign government is allowed to dictate that through an MOA, U.S. government no longer has control over it. If the foreign government is allowed to dictate what? The price overall. The price. Obviously has multiple components. One of which could be what type of technology we're using, how many spare parts, interoperability requirements, all the things that the U.S. government is taking into account in trying to decide how to scope this agreement. And I'll note here, we can make this concrete. There are September 2014 meeting minutes just before this program was terminated. The U.S. government and DAPA, the Defense Acquisition Program Administration, met and you'll see in those meetings that the U.S. government as a general matter repeatedly tells DAPA that both its legal and factual assertions in this case are wrong. And in particular, it tells DAPA over and over again, the $1.7 billion price that you want was tentative. It wasn't fully agreed. And second, it does not capture what is required to have a successful upgrade program. We will not give you the program you want for $1.7 billion. Okay, we'll back things up just for a second to the MOA. The MOA referred to the FMS process, did it not? It did. Now, how does that square with the answer you just gave me a few minutes ago that it was a possible DCS transaction and that would have been the basis for the MOA? Why was the MOA also referring to FMS? As you'll see in both the letters of guarantee and the MOA, there are some inconsistencies regarding both an FMS process or a DCS process. In the end, though, our ultimate argument is it does not matter whether BAE made the wrong choice or impermissibly entered into this MOA, BAE, neither BAE nor DAPA has the ability to alter the requirements of the FMS program. So you're saying that BAE may have entered into an ineffectual agreement insofar as any influence over the FMS process is concerned, but that doesn't make any difference? It's a two-part answer. First, I don't think that's actually what happened given the history here, but even if it were true, it wouldn't matter. BAE cannot exercise that influence. So tell me about the $43 million issue in this case. I mean, you signed this, I don't know, people characterize it in different ways, but you know what I'm talking about. Yes, so the... And you agreed to extend it, your client did, a couple of times, too. Correct. Okay. So the answer is, in essence, the same as to Judge Keenan. DAPA put great pressure on BAE and the other potential participants in this program to sign a variety of agreements, and those agreements are impermissible under the FMS program. And in the end, BAE signed those agreements to continue to go forward. I see how it is the same. And so what you're saying is that they signed it but didn't mean anything when they signed it? No. What it said is that they wanted to provide their best efforts to try to get the pricing that DAPA wanted. They did, in fact, do that. But even if they hadn't, DAPA's claims would be impermissible. So there's both the factual and legal aspect of this. We disagree with the idea that they, in bad faith, signed agreements. They, in bad faith, didn't try to live up to... Even if he did, it's not enforceable. Exactly. It's not a happy argument to make. Well, I'd like to turn to DAPA's characterization of the Trimble case. I think they have it exactly wrong. They attempt to distinguish Trimble by saying that that case dealt with third-party beneficiary status while this case deals with the MOA. However, as this course held in Trimble, it would be improper under the back-to-back contractual structure, and we haven't talked much about the FMS structure here, but the FMS structure has two aspects that are critical. One, there is no contract between the contractor and the foreign government. And two, there's an exclusive dispute resolution process that requires sovereign-to-sovereign consultations. Was that required after the first LOA was signed? When was that required in the context of the events that transpired in this case? When it comes to the dispute that we have now with respect to pricing, it was in existence from the very beginning. You're saying, what is the very beginning? A letter of request? It was always in effect. No foreign government is not allowed to try to exercise the type of control that Korea is trying to exercise. From the minute they initiated their letter of request, they had no authority to influence the price? Correct. Because they went this way. They could have done, if they had the direct contracting, it would be a different ballgame. Exactly. Within the context of FMS, they never had the authority. If they had gone through DCS, they would have. The U.S. government denied them the right to go through DCS. What is your argument about our case that you were launching into? So Trimble held that it was improper to imply a third-party beneficiary status based on the LOA. Well, if it's improper to imply third-party status, a direct contractual relationship, based on a contract the U.S. government negotiates and that reflects its policies, procedures, and preferences, it's even more improper to allow the foreign government to dictate a direct contractual relationship that doesn't reflect any of the U.S. government's policies and procedures. In fact, it's DAPA's claims in this case that are more an assault on the FMS program than the third-party beneficiary status in Trimble. Do you want me to explain more or do you just disagree? No, try a little more explanation. Sure. I'm always ready to be educated. So the FMS program says two things. One, the foreign contractor, the foreign government can't have a contractual relationship. And second, there's an exclusive dispute resolution mechanism. That structure led this court to conclude we're not going to allow the foreign government to try to step into the shoes of the U.S. government and force the LOA. Now, remember, the LOA reflects the U.S. government's policies and procedures and to the FMS program. The LOA is the agreement the U.S. government has agreed to and blessed. Now, and I'm sorry, I said the LOA. What I really mean is the prime contract between the contractor and the U.S. government. That agreement reflects the U.S. government's policies. Here, we don't have Korea saying, okay, we want to enforce the prime contract, the one the U.S. government agrees to. They're saying we want to impose our own requirements on the FMS process. That is even more of an assault than third-party beneficiary status. Was that clear? You have a cross appeal, too. We do. And you have to talk about that. If you're going to talk about it, John. Very briefly. Yes, I'm running out of time. So lastly, if you believe, as we do, that the district court was correct, the FMS program does not permit DAPA to sue BAE, the need for an anti-suit injunction flows naturally from that conclusion. Very briefly, the standard here is an abuse of discretion. That does not mean that the district court was irrational. It means, rather, that the district court was mistaken. As you'll see here, I believe that this court is in as good or even better a position than the district court to determine whether an anti-suit injunction is required. The district court decided one was not necessary because of the potential preclusive effect of the district court's summary judgment decision in the Korean action. Do you have any case in which a court has granted such an injunction against a foreign nation? There are no foreign anti-suit injunctions against a foreign nation. There are injunctions against foreign nations. The Second Circuit did so against Argentina in the bond case, NML Capital. And the Fifth Circuit did so against Iran in connection with the transfer of money based on a claim there. And in fact, the district court here did not decide that there was no need for an injunction because of the effect on the defendants. The district court determined that by opting into the FMS program and forgoing the right to bring suit in Korea, there would be no comedy, international comedy effects on the defendants. Rather, the district court focused on the indirect effect of an injunction on the courts in Korea. However, we believe that was mistaken for two reasons. First, all foreign anti-suit injunctions act as an indirect limitation on the foreign courts. And the interests here are both weightier and more directly relevant to the foreign anti-suit injunction than in any of those other cases. And further, DAPA doesn't argue that the preclusive effect of the district court's decision means that there should not be an injunction. To the contrary, they've argued here, they've argued in Korea that, in fact, the FMS program allows them to go forward. And in fact, they're making an assertion in the Korean court right now that BAE is responsible for any price increase on the FMS program, whether the United States government dictated it or not. So in light of the national security interests and the structure of the FMS program, we believe an injunction is proper here. How would a decree from the Korea court be, how would it be able to be enforced against your client? It could be, probably couldn't be enforced here. I think it shouldn't be enforced here. I assume it's incorporated in the United States. It is, but it has assets elsewhere. And further, it could be enforced in Korea and or in third countries, possibly. Are you representing it has assets in Korea? I don't believe they do right now. But this is not just a case about BAE. It's a case about the FMS program. And if a lawsuit by a foreign- What is our review of the district court's decision? What's our standard? It's abusive discretion, which means made a mistake. Right. We know about abuses. All right. Thank you very much. So I know I'm on borrow time. So your honors, I want to respectfully answer kind of a few questions that I think or that arise from what my esteemed colleague said. First, I heard him say that Korea shouldn't be able to dictate the terms of the FMS program. What I'd like you to do is read Trimble maybe the way that I do. Obviously, I do want you to read the way that I do. But Trimble, what they're asking you to do is allow them to participate outside of the FMS program. Because Korea said, look, we want bids because we want to try to control costs, which I think is a proper way to conduct business. So nobody forced BAE who voluntarily went into Korea and participated in this procurement process. There is a way for them to get the protections that they want. That is, allow the U.S. government to enter into an agreement with Korea for the sale of the airplanes. And then let the U.S. government put out the bid proposals. And then BAE can respond and get that protection. That's what happened in Trimble. Here, they want to have their cake and eat it, too. They want to be able to go out and get the business in a foreign country, agree under the terms of a foreign country to bond provisions, and then say, oh, sorry, guys. When they don't perform under the contract, say, oh, we want the same protections that were granted to Trimble. That just doesn't work here. Why isn't the message that BAE, you're a sophisticated government contractor. If you're going to participate in the FMS program, don't go to Korea and sign a contract where you're bound under Korean law to provide them certain services under your best efforts. Go through the normal process set up in the FMS situation. And I think they cannot distinguish the position that Korea is in when you look at the DFARS section 225-7330B. A foreign government may engage in a competitive bidding process to identify qualified contractors to develop a scope of work and negotiate pricing, including the LOR. When issuing the LOA, the U.S. government may rely upon it, but that's going to be dealt with by the U.S. government. And the government allows ancillary agreements. So let's assume that the LOA is signed. Korea can enter into ancillary agreements and can enforce those agreements even though it's part of the LOA. They have no answer to that. The better reading of Trimble, in my humble view, is that if you, a sophisticated international company, are going into a foreign country following their procurement rules and agreeing to be bound by a best efforts clause, and then there are factual disputes about whether you carry out those duties when those factual accounts arise. I mean, the U.S. government sent a letter that they're responsible for $250 million, a quarter of a billion dollars of the price increase, almost a third of it. That's significant. Did they use their best efforts or did they do a bait and switch, as the court posited? So our respective position is that Trimble cannot be read the way that they're asking your honors to read it. The national security interests here are overstated and in opposite. The only national security interest articulated in Trimble was that foreign governments are never going to step into the shoes of U.S. government in a situation where you're seeking to be a third-party beneficiary. That's not happening here. There's a direct contract which is enforceable under the laws of Korea. And what I would note to the court, finally, is that there's no amicus here. The government knows how to come into court and say that this is a specific, you know, U.S. interest that we have to be dealing with. Did either party request the government do that? I was curious about that. We certainly didn't, but they certainly could have. And I don't know if they did or if they didn't, but they're the ones who are trying to say this is such an important national security interest, and yet the record is silent on that. I know that my time is running out. So what I would... When you said we certainly didn't, do you mean you think you believe the government's position would be that there is a national security interest? No, I don't think that the government believes... Then it would be to your benefit to get the government in here saying that, right? Well, I think when... It could, but I think when you're trying to distort the black letter law that's in this circuit to create a second exception where the U.S. government was fully aware of this MOA and what Korea was trying to do, and the fact that Korea is trying to enforce it, and BAE, through all of its might, couldn't get the government to come in. I think that's telling. Finally, I think the court aptly stated that the court has to review whether the district court abused its discretion. I think for the reasons submitted in our paper with respect to the anti-injunction suit, that those arguments don't hold merit and we'll submit on our papers. Thank you very much. You can only respond to the last sentence or so. But maybe you can tell me, did you ask the government to file an amicus brief here? We never formally requested that they did. There were some discussions and they never went very far. I think that's the wrong question with respect to... When Congress enacted the Foreign Sovereign Immunities Act, it stated explicitly that a system in which the U.S. government has to intervene case by case in every instant there's a dispute with a foreign sovereign is unworkable and hard to predict. Is this some sort of legislative history? It is and it's cited in our briefs as well, as well as cases that support that conclusion. The various factors that go into that decision for the U.S. government are varied and often don't relate to the merits here. And in fact, here the U.S. government has made very, very clear its position. First, in enacting the FMS program, it made clear that there's... I guess I'm asking a narrower question. You can't have a surrebuttal on the merits. A narrower question of whether you ask the government to file an amicus brief or to make its preference, its position known in this case. I guess the answer is yes, but they wouldn't do it. There were initial conversations and it never went anywhere. If that's yes, they wouldn't do it. Yes. Legislative history doesn't address the question of amicus briefs in individual cases, does it? It addresses the issue of whether the... This is under the Foreign Sovereign Immunities Act. It used to be that under the Tate letter that the U.S. State Department had to intervene in specific cases to decide whether the foreign government was entitled to foreign sovereign immunity, and Congress said that's an unworkable system. And do you have anything in response to the one sentence? The one sentence? I will. Your Honor, we think we win for the reasons we said. However, at a minimum, we would request that this panel remand the case to the district court to determine whether the Korean court will give deference to this court's decision in a way it hasn't. Your Honor, we know whether it will or not. You're saying it's a matter of Korean law, whether it's required to? Correct. So it has not. For the last almost year, the Korean action has persisted and preclusive effect has not been given to the district court's decision. So at a minimum, we would request, and it's in the record that we have put evidence that two things. One, the Korean court will examine public policy issues to see whether it will give preclusive effect. And second, it doesn't treat the district court's decision as final for those purposes. It may treat this court's decision as final for those purposes. So at a minimum, we would request that the court remand this case to the district court to monitor how the Korean court treats this court's decision once issued. Thank you very much. Thank you. We will ask our clerk to adjourn court and then we'll come down and say hello to the lawyers. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Diana Gribbon Motz, Barbara Milano Keenan, Stephanie D. Thacker